**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| M.S., et al., | No. CV-23-00344-TUC-JAS (MSA) |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| v. | |
| Tanque Verde Unified School District, | |
| Defendant. | |

N.S. (Student), by and through his parents (Parents), appeals an administrative decision finding that Defendant Tanque Verde Unified School District (District) did not violate the Individuals with Disabilities Education Act (IDEA). For the following reasons, the Court will recommend that the administrative decision be reversed.

**Statutory Background**

The IDEA allocates federal funds to states on condition that states "make a 'free appropriate public education' (FAPE) available to all children with disabilities." *N.D. v. Reykdal*, 102 F.4th 982, 987 (9th Cir. 2024) (citing 20 U.S.C. § 1412(a)(1)(A)). "The hallmark of a FAPE for students with disabilities is the individualized education program (IEP), which is 'a written statement for each child with a disability that is developed, reviewed, and revised' at least annually." *J.B. v. Kyrene Elementary Sch. Dist. No. 28*, 112 F.4th 1156, 1159 (9th Cir. 2024) (quoting 20 U.S.C. § 1414(d)(1)(A)(i)). The IEP "should assess the child's current academic performance, articulate measurable educational goals, and specify the nature of the special education and services the school district will

provide." *L.A. Unified Sch. Dist. v. A.O. ex rel. Owens*, 92 F.4th 1159, 1165 (9th Cir. 2024) (citing 20 U.S.C. § 1414(d)(1)(A)(i)).

The IDEA creates "formal procedures for resolving disputes" over IEPs. *Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1130 (9th Cir. 2021) (quoting *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 159 (2017)). "If parents believe that a school has denied their child a FAPE, they may present a complaint to the local or state educational agency." *L.B. ex rel. Morrisey v. San Diego Unified Sch. Dist.*, 168 F.4th 1150, 1155 (9th Cir. 2026) (citing 20 U.S.C. § 1415(b)(6)). If the complaint cannot be resolved through mediation, the parents "are entitled to an impartial due process hearing conducted by the local or state educational agency. Any party dissatisfied with the outcome of the state administrative hearing may seek review in a federal district court." *A.O.*, 92 F.4th at 1165 (citing 20 U.S.C. § 1415(f)(1)(A), (i)(2)(A)).

**Factual and Procedural Background**

**I.    The August 2020 IEP**

Student, a longtime enrollee in the District, had a history of anxiety-driven school refusal dating back to 2017. (R107 at B5; R133 at 287.) In April 2018, Student's mother (Mother) informed the District that Student was being treated for anxiety, which had "contributed to many school absences." (R104 at A16.) She later requested that the District reevaluate Student for an emotional disability, stating that Student's "school avoidance [was] directly related to his anxiety" and that his anxiety needed to be addressed in his IEP. (R104 at A26; R107 at B33.) In October 2018, the District convened a meeting of the Multidisciplinary Evaluation Team, which found that Student qualified for special education services for an emotional disability and a specific learning disability in reading comprehension. (R104 at A27.)

Student's freshman year at Tanque Verde High School (the 2018-2019 school year) was plagued with anxiety-related absences. (R107 at B25–45, B72–84.) In August 2019, Parents provided the District with an "Exemptions from School Attendance" form filled out by Student's psychiatrist, Dr. Kevin Leehey. (R104 at A101–02.) Dr. Leehey identified

Student's diagnoses as anxiety with school phobia, depression, and ADHD and explained that Student's conditions were "persistent" and would "likely increase with return to school [and] transition to classroom(s)." (R104 at A101.)

Due to Student's absences and inability to take online courses at the District, Parents withdrew Student from the District and enrolled him at Primavera Online High School for his sophomore year (the 2019-2020 school year). (R133 at 288–89.) Primavera's online format was asynchronous, or self-paced. (R142 at 13.) While attending Primavera, Student had an IEP for his emotional disability and learning disability in reading comprehension. (R104 at A105.) Student's IEP included a language arts goal to increase his reading comprehension and a social emotional goal to reach out to his case manager three times each quarter. (R104 at A111–12.) His accommodations included testing in a small group environment, extended time to turn in assignments, and the ability to complete sections of his classes out of sequence. (R104 at A113.) Student passed all his classes with As, Bs, and Cs and made progress on his goals. (R104 at A111–12, A220.)

Student wanted to return to Tanque Verde High School for his junior year (the 2020-2021 school year), so Mother contacted the District in early 2020 to enroll him and "touch base" on his IEP. (R107 at B126–27.) Mother asked whether Student had the "option to start classes part-time and work up to full-time" or "do a blended day" with "a few classes at school and a few online at home," as those were mentioned as possibilities in Student's last IEP at the District. (R107 at B132–33.) She explained that she wanted "to collaborate" with the District to find a way to "help someone like [Student] with anxiety transition from full-time online school to successfully being at school[.]" (R107 at B137.) She also wanted to know whether Student could "be switched to online [classes]" if in-person attendance did not "work out." (R107 at B167.)

The District convened a meeting on August 24, 2020, to review and revise Student's IEP. (R104 at A148.) As of the meeting date, all students in the District had been attending class online for a few weeks due to the COVID pandemic. (R133 at 30.) During that period, Student struggled with attendance, participation, and work completion. (R104 at A158–59;

R107 at B197–98.) The IEP team observed that while Student had been successful in prior online classes, he was "struggling with the current [synchronous] online format which require[d] more interaction with teachers and classmates." (R104 at A159.) The team also observed that Student's "social anxiety may prevent him from attending/participating in his classes." (R104 at A159.) Mother requested an accommodation that Student be placed with people he knew for small-group assignments. (R142 at 89.) She did not otherwise voice concern with continuing the services and accommodations that Student had received at Primavera. (R142 at 89.)

The August 2020 IEP was very similar to Primavera's. (R142 at 90–91.) Student's eligibility categories remained the same, as did his language arts goal. (R104 at A156, A162.) Student's social emotional goal was amended so that he would reach out to his case manager more often (once a week instead of three times a quarter). (R104 at A163.) His accommodations included testing in a small group environment, up to three extra days to turn in assignments, and being placed with students he knew for small-group assignments. (R104 at A164.) The accommodation allowing Student to complete sections of his classes out of sequence was not consistent with the District's synchronous learning format and was thus removed. (R142 at 91.)

After the IEP was implemented, Student continued to struggle with attendance, participation, and work completion. (R107 at B207–11, B220–25; R142 at 93–94.) When a hybrid online and in-person option became available in October 2020, Parents submitted another "Exemptions from School Attendance" form from Dr. Leehey. (R104 at A175–76.) Dr. Leehey reconfirmed that Student's diagnoses were "persistent [and] continuous" and explained that Student needed to be reintegrated into school gradually and would "likely exceed the allowed number of absences because of school phobia." (R104 at A175–76.) A week later, however, the District approved Parents' request that Student be allowed to remain online only due to anxiety. (R107 at B215.) In November 2020, after being advised that Student had not turned in any math homework since October, Mother asked the District for a meeting. (R107 at B234.) The meeting was held a few days later with Mother,

Student's teachers, and Student's case manager, Christine Nielsen, present. (R107 at B237, B244–45.) Nielsen sent an email summarizing her "takeaway from the meeting," which was that Student "need[ed]" to attend classes from start to finish, interact with the teacher and class orally and through chat, and turn in assignments on time. (R107 at B244–45.) Student's struggles continued after the meeting through the end of the fall semester. (R107 at B266–67, B279–80, B283, B286, B290.) He failed English but passed his other classes, mostly with Cs and Ds. (R104 at A220.)

Student's problems resumed almost immediately in the spring semester. (R107 at B313–18.) In response, Nielsen emailed Mother and Student, stating that the District's online format was synchronous and that Student was expected to attend all live classes and turn in assignments on time. (R107 at B319.) Nevertheless, teachers reported throughout the semester that Student was not attending, participating, or completing his work. (R107 at B323, B328, B330–31, B335, B341, B350–51, B383, B392–94, B405, B407.) By early May 2021, Student was certain to fail all his core classes. (R107 at B398, B414.)

## II.    The May 2021 IEP

In April 2021, Nielsen scheduled an IEP meeting for May 14 (two weeks before the end of the semester) to ensure that Student had an updated IEP going into a credit-recovery year. (R104 at A256; R107 at B406, B413; R142 at 136.) Nielsen followed up with Mother on May 11, asking what Student's "plan [was] for next year" so that she could make his IEP "appropriate to whichever setting he [would] be in." (R107 at B416.) Mother responded that the plan was for Student "to do an online school," but that he had not "decided whether he want[ed] to do Primavera or Grad Solutions." (R107 at B416.) Like Primavera, Grad Solutions offered a self-paced curriculum. (R142 at 118.) Mother further indicated that Student wanted to take English over the summer at the District. (R107 at B416.)

Mother attended the meeting on May 14, where she acknowledged that it had been a "rough year" for Student "both academically and in terms of his mental health." (R104 at A202.) The IEP team discussed Student's present levels, including reports from each of his teachers that he was not attending, participating, or turning in work. (R104 at A202–03.)

The team also observed, as it had at the last IEP meeting, that Student's struggles were the result of anxiety and that "synchronous class structure was very difficult for him." (R104 at A202–04.) As Mother had indicated that Student would be returning to the asynchronous format where his existing accommodations and services had allowed him to be successful, the May 2021 IEP was nearly identical to the August 2020 IEP, which in turn was very similar to the Primavera IEP. (R142 at 90–91, 112.) Student went on to pass his electives but fail all his core classes. (R104 at A220.)

On May 24, Mother notified the District that Student would not be taking summer classes, and the District removed him from the summer school list. (R107 at B425.) On June 7, Mother asked the District to withdraw Student because he would be starting an online school, and the District withdrew him. (R107 at B435.) The District later received a records request from Grad Solutions. (R104 at A293; R142 at 171.)

**III.    Enrollment at Live Strong House**

On May 30, 2021, Dr. Leehey wrote a letter describing Student's mental health conditions and immediate "need for a residential treatment-oriented level of care." (R113 at G1 (emphasis omitted).) Dr. Leehy explained that Student had been diagnosed with major depression, multiple anxiety disorders, ADHD, a learning disorder in reading, low-average intellect, and parent-child problems. (R113 at G1.) He explained that Student's clinical manifestations included having "given up," which had led to "his severe and completely incapacitating non-compliance with all aspects of his treatment and his life." (R113 at G1 (emphasis omitted).) Dr. Leehy asserted that Student's condition was a "crisis" that "require[d] medically (psychiatrically) necessary residential treatment at a facility capable of treating him three to six months." (R113 at G2 (emphasis omitted).)

On July 15, Parents enrolled Student in a wilderness program, Outback Therapeutic Expeditions. (R113 at G27.) While at Outback, Student was evaluated by Dr. Todd Corelli, a licensed clinical psychologist. (R113 at G3–26.) Dr. Corelli authored two reports: an "educational" assessment and a "psychological" assessment. (R113 at G3–26.) In the educational assessment, Dr. Corelli wrote that intellectual and academic testing showed

that Student's IQ and academic achievement were in the average range, but that Student had executive functioning deficits. (R113 at G10.) He diagnosed Student with ADHD and executive functioning deficits and opined that Student would need "specific, practical, step-by-step instructions and guidelines" to overcome such deficits. (R113 at G10.) The psychological assessment includes everything in the educational assessment in addition to detailed information about Student's psychological condition. (R113 at G11–26.) In the psychological assessment, Dr. Corelli added diagnoses of generalized anxiety disorder, social anxiety disorder, and major depressive disorder. (R113 at G26.) He "recommended that following his stay at Outback, [Student] go on to a longer-term therapeutic residential school that [could] address each of [his] issues in depth." (R113 at G26.) He opined that Student "need[ed] structure, skills training, and regular therapy and feedback," and that "[r]egular individual, group, and family therapy [would] all be important." (R113 at G26.)

Student was discharged from Outback on September 23, 2021, and enrolled by Parents in Live Strong House (LSH) the same day. (R113 at G31; R110 at D95.) LSH is a residential support program that provides wraparound mental health treatment as well as educational services. (R133 at 131–33; R140 at 18.) LSH's philosophy is that mental health and educational performance are inextricably connected. (R133 at 142–44.) Its treatment modalities "are designed to help with anxiety, depression, ADHD, trauma, substance abuse, communication skills, irrational beliefs, executive functioning, relationships, etc." (R110 at D73.) Its educational services are provided through Coral Sands Academy, Inc., an online private school, pursuant to an educational services agreement. (R110 at D88; R133 at 233, 235.) Under the agreement, Coral Sands provides LSH with an asynchronous curriculum; teacher support and supervision of courses; individual and group tutoring; and high school diplomas. (R110 at D88; R133 at 235, 239.) While a student can enroll in Coral Sands and complete the program without an in-person teacher, a student at LSH works in a classroom with an LSH teacher and up to seven other students present. (R100 at P1-7; R133 at 200, 245.) In addition, LSH's academic director, Monica Prusse, works closely with Coral Sands to modify the curriculum to meet LSH students' individual needs. (R133

at 133, 236, 243.) Prusse and Megan Pomeroy, Coral Sands's academic director, agree that educating LSH students is a "team" effort. (R133 at 183, 242.)

Student's treatment plan at LSH addressed all diagnoses listed in Dr. Corelli's assessments. (R140 at 20–21; *compare* R113 at G26, *with* R110 at D115–16.) Student received, among other things, 2 hours a week of individual counseling and 3 hours a week of group therapy. (R133 at 204.) Student worked in a classroom four days a week, where he had autonomy in completing his asynchronous classes. (R100 at P1-8; R110 at D39.) Student had access to his therapist during the school day and received 6 hours a week of specially designed instruction from an executive functioning coach, special education teacher, and general education teacher. (R100 at P3-22; R140 at 16–17.)

**IV.    The January 2022 IEP**

A few days after enrolling Student at LSH, Mother contacted the District to request an IEP meeting. (R107 at B438–39.) In response to several questions from Ivonne Olivas, the District's lead psychologist, Mother explained that Student had been placed at LSH and that LSH was "asking for an IEP meeting from his home school." (R107 at B438.) In response to several more questions about LSH, Parents responded that they had placed Student there "because he was not able to access school due to his debilitating mental health issues." (R107 at B437.) Parents criticized the May 2021 IEP, stating that it had "failed to address [Student's] struggles whatsoever" and that Student "was a sinking ship" while at the District. (R107 at B437.) Parents asserted that Student would remain at LSH unless the District could offer him a FAPE, and that they would seek reimbursement for the costs of placing him there. (R107 at B437.) Finally, Parents repeated their request for an IEP meeting and stated that they wanted the District to consider placing Student at a residential treatment center. (R107 at B437.)

The District convened three IEP meetings, attended by Parents; their advocate, David Jefferson; Prusse; Olivas; Nielsen; the District's director of student services, Tiffany Hodge; and a general education teacher from the District. (R100 at P1, P2, P3.) During the meetings, Prusse provided the IEP team with considerable information about Student's

present levels at LSH. (R104 at A231–33.) Student had a high degree of work completion and had recovered his grade level. (R100 at P1-8, P2-10.) He interacted with teachers and peers and had started advocating for himself. (R100 at P1-7, P1-9; R104 at A232–33.) And every day he was going "up the stairs to the classroom with a smile on his face." (R100 at P1-7.) Prusse emphasized that Student's "social/emotional and educational needs [could not] be managed separately," and that his progress was the product of LSH's structured environment and wraparound services, which were "critical to provide him access to his education." (R104 at A232; *see* R100 at P1-9, P2-7–10, P2-14.) Parents also provided information, including that Student had been placed in the wilderness program because of increasing anxiety, depression, and isolative behavior. (R104 at A231, A234.) Parents also explained that Student had "struggle[d] emotionally across all settings for a long time," including at school where he "refused to engage with his teachers or peers and disconnected from everything." (R104 at A234.)

The January 2022 IEP included six social emotional goals aimed at Student requesting assistance with nonpreferred tasks, identifying his and others' emotions and related behaviors, identifying coping strategies for stressful situations, and breaking down complex tasks. (R104 at A236–37.) It included ten accommodations, including provision of a consistent daily routine; use of visual tools to help break down assignments; the ability to break down assignments into smaller parts; frequent monitoring of independent work to ensure completion; extra test time; placement with friends for small-group assignments; teacher prompting to initiate tasks; breaks as needed; testing in a small group environment; and extended time to turn in assignments. (R104 at A238.) The IEP provided for 5 hours a week of specially designed instruction from a special education teacher, an additional 5 hours a week in a special education classroom, and 30 minutes a week of counseling. (R104 at A244.)[1]

---

[1] Plaintiffs dispute that Student would have been in a special education classroom 10 hours a week. (Reply Br. 18.) The IEP provides that Student would receive 1 hour of specially designed instruction every day, but that Student would be in study support "for more than" 1 hour a day. (R104 at A244.) Olivas testified that each study support class is about 1 hour in length. (R142 at 215.) And Student's proposed schedule had him in study support both first and seventh period. (R104 at A246–47.) This adds up to 10 hours a week.

During the third IEP meeting, Parents and their advocate questioned how the District came up with 30 minutes a week of counseling when Student was receiving 5 hours a week at LSH. (R100 at P3-23.) Olivas responded that, when the District provided counseling, it "typically" started with 30 minutes a week and then determined whether more or less was needed. (R100 at P3-23.) Olivas added that "a lot" of Student's counseling at LSH was "therapeutic," and that the District would be addressing only "the school-setting stuff." (R100 at P3-23.) The prior written notice echoed Olivas's remarks, stating that Student's counseling at LSH went "far beyond his educational needs" and was not part of his least restrictive environment. (R104 at A246.)

Parents rejected the District's offer, and Student remained at LSH. (R100 at P3-27; R133 at 145.) Student graduated from high school in August 2022 and remained at LSH in a postgraduate program. (R110 at D252; R133 at 145.)

**V.      Administrative Proceedings**

In June 2022, Parents filed a due process complaint claiming that the District had failed to offer Student a FAPE and that they were entitled to reimbursement for the costs of his placement at LSH. (R2.) The administrative law judge (ALJ) granted the District summary judgment on the issue of reimbursement, finding that such relief extends only to the costs of nonprofit schools and thus was not available for the costs of LSH, a for-profit entity. (R88.) The matter proceeded to a four-day hearing, where the ALJ heard testimony from numerous witnesses. (R133; R140; R142; R149.) After the hearing, the ALJ issued a decision finding that the District had offered Student a FAPE and thus declining to decide whether LSH was a proper placement. (R131.) This lawsuit followed. (Doc. 1.)

**Standard of Review**

"The IDEA empowers federal courts to 'receive the records of the administrative proceedings,' 'hear additional evidence at the request of a party,' and 'grant such relief as the court determines is appropriate.'" *L.B. ex rel. Morrisey v. San Diego Unified Sch. Dist.*, 168 F.4th 1150, 1158 (9th Cir. 2026) (quoting 20 U.S.C. § 1415(i)(2)(C)). While this standard of review "is less deferential to the State administrative proceedings than in other

cases reviewing administrative decisions," the district court "will give 'due weight' to the ALJ's decision if it is based on 'thorough and careful' findings." *J.B. v. Kyrene Elementary Sch. Dist. No. 28*, 112 F.4th 1156, 1161 (9th Cir. 2024) (quoting *Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995)). In general, courts "treat a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" *L.A. Unified Sch. Dist. v. A.O. ex rel. Owens*, 92 F.4th 1159, 1168 (9th Cir. 2024) (alteration in original) (quoting *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007)). But these factors are not decisive; "the district judge must actually examine the record to determine whether it supports the ALJ's opinion," *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 & n.1 (9th Cir. 2017) (citing *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 440 (9th Cir. 2010)), and "[i]n the end . . . the court is free to determine independently how much weight to give the state hearing officer's determinations," *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009).

## Discussion

Plaintiffs contend that the August 2020, May 2021, and January 2022 IEPs did not offer Student a FAPE; that LSH was a proper placement for Student; and that they are entitled to reimbursement for the costs of placing Student at LSH. The ALJ found that all three IEPs offered Student a FAPE and thus declined to decide whether LSH was a proper placement. The ALJ also found that the regulation providing for reimbursement does not apply to the costs associated with LSH, as LSH is a for-profit entity. For the reasons given below, the Court gives no deference to the ALJ's findings. The Court finds that all three IEPs denied Student a FAPE, and that Plaintiffs are entitled to reimbursement for tuition.

## I.     The District denied Student a FAPE.

"To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's

circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017). Under the "snapshot" rule, review of an IEP is limited to "the information that was reasonably available to the parties at the time of the IEP." *Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1187 (9th Cir. 2016) (citing *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)).

### A.    August 2020 IEP

At the time of implementation, the August 2020 IEP was not reasonably calculated to provide Student with an educational benefit. It is true that the IEP carried over goals, accommodations, and services that had allowed Student to earn passing grades at Primavera. However, the record shows that the District knew at the time of drafting that Student had anxiety-driven school refusal and access barriers in the synchronous online format. Despite such knowledge, the IEP offered no specialized instruction or supports addressing Student's barriers. For this reason, the IEP did not provide a FAPE.[2]

Student was missing school at the District because of his anxiety as early as 2017. (R107 at B5.) In April 2020, Mother reminded the District that it had previously considered "options of online with homebound services or a blended option with online classes," and she asked whether those were still options. (R107 at B132–33.) She emphasized the need "to collaborate" to "help someone like [Student] with anxiety transition from full-time online school to successfully being at school." (R107 at B137.) She further asked whether Student could be moved to fully online classes if in-person classes did not "work out." (R107 at B167.) Mother's emails led the District to review Student's prior IEP, which noted Student's treatment "for social anxiety and school anxiety" and related school absences. (R107 at B132.) So, long before the IEP team even met, the District was aware of Student's ongoing anxiety and the likelihood it would affect his education.

The school year began fully online because of the pandemic. (R133 at 30.) At the

---

[2]    The conclusions in this report are based in part on events that would be barred under the IDEA's statute of limitation. While Plaintiffs may not seek relief based on those events, the events are nevertheless relevant as to the District's awareness of Student's needs. *See J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 444–45 (9th Cir. 2010) (adopting the district court's opinion in full, including the court's finding that time-barred facts could be considered as to what the school district knew during the limitation period).

- 12 -

time of the IEP meeting, on August 24, 2020, Student had been attending classes for a few weeks and already shown signs of struggling with the synchronous online format. His teachers reported that he had not logged into classes, not taken placement tests, and not completed assignments, and his math teacher reported that she had "zero knowledge base of him." (R104 at A158–59; R107 at B191, B197–98.) At the meeting, the IEP team noted that "[d]ifficulties with anxiety hamper [Student's] availability for instruction that would typically be expected of his peers, even in an online course setting," and that "social anxiety may prevent him from attending/participating in his classes." (R104 at A158–59.) Even more specifically, the team noted that while Student's "behavior did not impact online learning in the past, he [was] currently struggling with the current online format which require[d] more interaction with teachers and classmates [than his prior asynchronous online classes]." (R104 at A159.)

The District knew that Student's social anxiety and the synchronous online format impeded Student's attendance, participation, and work completion, yet the August 2020 IEP effectively repeated goals and minimal services tailored to Primavera's asynchronous format. Replicating the Primavera IEP in this context failed to address Student's unique needs.[3]

The District argues that it was reasonable to make the August 2020 IEP substantially similar to the Primavera IEP, as the latter had "enabled Student to earn As, Bs, and Cs in all of his classes in an online format." (Resp. Br. 22.) The District further says that because "Parents did not report any new educational or functional concerns" at the IEP meeting, there was "no reason to believe that the accommodations that Student had previously received were no longer sufficient." (Resp. Br. 22.) The District adds that Student's "difficulty with the synchronous, online format was not the red flag that Parents make it out to be, because so many other students were having similar struggles" transitioning to

---

[3] The IEP modified Student's social emotional goal so that he would contact his case manager more often. (R104 at A163.) This did not render the IEP adequate. Student's anxiety led to attendance and participation issues. Without providing specially designed instruction and related services targeted at those issues (e.g., counseling), requiring more check-ins, by itself, would not remove Student's barriers to accessing his education.

online classes because of COVID. (Resp. Br. 22.)

These points are not persuasive, as they ignore relevant context discussed above. The District knew Student's history of anxiety and school refusal, and Mother's emails months before the IEP meeting put the District on notice that those were ongoing issues. In addition, the District oversimplifies the matter by suggesting that Student's prior success "in an online format" made it reasonable to repeat his prior accommodations and services. Student, a person with social anxiety, was switching from a format where he had "access to the curriculum 24 hours a day allowing for a more flexible schedule" to a format where he would have live interaction with teachers and classmates. (R104 at A132, A159.) His immediate failure to attend and participate should have signaled to the District that there was a problem. And it did: the IEP reflects that Student's "social anxiety may prevent him from attending/participating in his classes" *and* that Student was "struggling with the current online format which require[d] more interaction with teachers and classmates." (R104 at A159.) In this context, it was unreasonable to think that Student was facing the same problems as other students. This is true even considering Parents' lack of concern at the IEP meeting. Although that factor supports the District, all other information available strongly indicated a need to address Student's anxiety, and the IEP did not do so.

The District also relies on its expert psychologist, Dr. Janice Sammons, who opined that the August 2020 IEP provided Student a FAPE. (Resp. Br. 22–23; R149 at 23–25.) Dr. Sammons's opinion is not persuasive, for a few reasons. First, it is based on incomplete information. Dr. Sammons testified that schools must rely on reports from parents about their children, and her opinion is based in part on Parents' supposed lack of concern with Student's progress. (R149 at 19, 22–23.) But she did not review any of the email exchanges. (R149 at 76.) Mother advised the District months before the IEP meeting that Student's social anxiety was ongoing, and it was severe enough that she wanted a plan in place if Student could not attend school in person. (R107 at B137, B167.) Thus, Parents provided the notice that was so important to Dr. Sammons. Second, Dr. Sammons's opinion is poorly explained. She reviewed the August 2020 IEP and, as just noted, placed significance on

Parents's failure to voice concerns during the IEP meeting. (R149 at 22–23.) But she did not explain her reasons for minimizing the significance of other information in the IEP, which affirmatively pointed to anxiety-related school refusal.

Third, and relatedly, Dr. Sammons's opinion conflicts with her other testimony. She testified that student needs expressed in an IEP's "functional performance" section must be addressed in the IEP so that the student can access the curriculum. (R149 at 72.) She further testified that schools have an obligation to address a student's anxiety to the extent necessary to enable the student to access the curriculum. (R149 at 60, 90.) The functional performance section of Student's IEP contains the following information: Student "is currently struggling with the current online format which requires more interaction with teachers and classmates"; Student "keeps his microphone off due to social anxiety"; "teachers are concerned with [Student's] lack of participation"; Student's "social anxiety may prevent him from attending/participating in his classes"; and Student's "anxiety impacts his ability to advocate for himself." (R104 at A159.) In short, Student's IEP reflected anxiety-related barriers to accessing the curriculum. Dr. Sammons's testimony that schools have an obligation to address such barriers does not align with her opinion that the IEP—which did nothing to address anxiety—provided a FAPE.

The ALJ concluded, based on the same analysis offered by the District, that the August 2020 IEP offered a FAPE. (R131 at 28–29.) That analysis ignores important context and relies uncritically on Dr. Sammons's testimony despite its glaring issues. Therefore, the Court gives the ALJ's conclusion no deference. The Court finds by a preponderance of the evidence that, at the time of implementation, the August 2020 IEP was not reasonably calculated to provide Student with an educational benefit.[4]

. . . .

. . . .

---

[4]     The parties devote much attention to what occurred after the August 2020 IEP was implemented. (Opening Br. 26-28; Resp. Br. 23–24; Reply Br. 4–8.) Under the snapshot rule, such events are generally not relevant. To the extent Plaintiffs argue that the District violated the IDEA by not updating the IEP during the school year, the Court agrees with the District that Plaintiffs did not properly present that issue. (Resp. Br. 23.)

**B.      May 2021 IEP**

At the time of implementation, the May 2021 IEP was not reasonably calculated to provide Student with an educational benefit. The plan was implemented two weeks before the end of the school year, when the District had far more information indicating that Student needed a heightened level of services. Following implementation of the August 2020 IEP, Student continued to not attend, not participate, and not complete assignments. (*See* R107 at B207 (September 19: "sporadic" attendance in physics with a 34% grade); B208 (September 26: math teacher "concerned" that Student was not "actually attending class"); B210 (October 8: missing math assignments); B221 (November 9: missing several weightlifting assignments); B261 (November 13: missing homework "since the end of October"); B286 (December 2: failing grade in history); B290 (December 17: missing too many assignments to pass English); B313 (January 22, 2021: not participating in English); B315 (January 23: missing assignments in physics with a 39% grade and missing five math assignments with a 64% grade); B359 (March 1: Nielsen was "very concerned" with Student's grades); B386 (March 29: Nielsen says Student's "grade situation" was "pretty bleak"); B398 (April 26: Mother says Student will focus on his electives since he can no longer pass his core classes).) While Student passed all but one class in the fall semester, he did so largely with Cs and Ds. (R104 at A220.) In the spring semester, he was certain to fail all his core classes when the May 2021 IEP was implemented. (R107 at B414.)

Despite the foregoing, the May 2021 IEP was effectively a repeat of the August 2020 IEP. As the prior plan had already failed to enable attendance, participation, or work completion in the synchronous online format, replicating that plan was not reasonably calculated to confer an educational benefit. In fact, the May 2021 IEP may even have been worse. While Student's prior social emotional goal was to reach out to his case manager (who presumably could have offered help), his new goal was simply to turn in 80% of his assignments. (R104 at A207.) This goal did nothing to help Student identify triggers or cope with anxiety; it simply shifted compliance obligations onto him without responding to his needs. Given the foregoing, the IEP did not provide Student a FAPE.

The record shows that, before the May 2021 IEP was drafted, Mother notified the District that she intended to enroll Student at either Primavera or Grad Solutions, which both use an asynchronous online format. (R107 at B416; R142 at 117–18.) Nielsen drafted the IEP with Student's future placement in mind. (R107 at B416; R142 at 117.) Based on these facts, the District argues that it was reasonable to make the IEP substantially similar to the August 2020 IEP, which in turn was similar to the Primavera IEP. (Resp. Br. 25–26.) This approach makes sense given Student's success at Primavera, but the Court sees a couple of problems.

To begin, the Court is not aware of authority supporting the proposition that an IEP can be drafted in anticipation of an uncertain, future out-of-district placement. The cases indicate otherwise, stating that "placement [must] be based on the IEP, and not vice versa." *K.D. ex rel. C.L. v. Haw. Dep't of Educ.*, 665 F.3d 1110, 1123 (9th Cir. 2011) (citing *Spielberg ex rel. Spielberg v. Henrico Cnty. Pub. Schs.*, 853 F.2d 256, 259 (4th Cir. 1988)). In addition, as Plaintiffs observe, the May 2021 IEP identifies Tanque Verde High School as Student's school, and the plan was implemented with two weeks of classes remaining. (Opening Br. 29; Reply Br. 9; R104 at A200, A256.) Indeed, the District argues in this case that "each IEP was reasonably calculated to allow Student to have academic success within the District." (Resp. Br. 39.) Given the foregoing, the Court finds that the May 2021 IEP must be analyzed in the context of Student's enrollment in the District.

The ALJ also took a pragmatic approach on this issue, finding that the IEP offered a FAPE because it was designed with Student's future placement in mind. (R131 at 29–30.) That logic is not persuasive for the reasons just given. The ALJ also relied on the opinion of Dr. Sammons that the IEP was appropriate. (R131 at 24, 29.) Dr. Sammons's opinion is not persuasive, though, because it is inconsistent with her other testimony. As noted, she agreed that an IEP should address needs expressed in the functional performance section, and that schools must address students' anxiety at least to some extent. (R149 at 60, 72, 90.) The performance section of the May 2021 IEP reflects Student's difficulties with anxiety, school refusal, and the synchronous format. (R104 at 202–04.) Dr. Sammons reviewed this

information and somehow concluded that none of it suggested a need for "more intensive educational services." (R149 at 32.) Her opinion is not consistent with her view of a school's role in addressing emotional disabilities.

For these reasons, the Court gives no deference to the ALJ's conclusion. The Court finds by a preponderance of the evidence that, at the time of implementation, the May 2021 IEP was not reasonably calculated to provide Student with an educational benefit.

### C. January 2022 IEP

At the time it was offered, the January 2022 IEP was not reasonably calculated to provide Student with an educational benefit. The IEP had six social emotional goals, ten accommodations, and specialized instruction and counseling totaling 5.5 hours a week (with another 5 hours spent in a special education classroom). (R104 at A236–238, A244.) But the IEP predicated Student's progress on general education attendance at a large public campus in a synchronous system—something he was unable to do in the past—without providing sufficient day-to-day supports. In addition, the record shows that the amount of counseling offered (30 minutes a week) was based on the District's standard way of doing things rather than on Student's unique needs. Thus, the IEP did not provide a FAPE.

During the IEP meetings, Prusse provided information indicating that Student was doing well in his self-paced classes, which were provided in a classroom with no more than eight students. (R100 at P1-7–8.) She also explained that Student's emotional disability was inextricably connected with his educational needs, and that his school refusal "was symptomatic of a lot of the social and emotional deficits and the executive functioning . . . deficits." (R100 at P2-9.) She further explained that the pressures of a large classroom gave Student a lot of anxiety and that, while she had not seen him in that setting, she believed it would cause him to "nosedive" in terms of his ability to interact with peers and self-advocate. (R100 at P2-8, P3-26; R104 at A233.) She also explained that the 5 hours a week of counseling Student was receiving at LSH was necessary to get him into the classroom, and that Student needed a "very structured environment." (R100 at P1-9, P3-23.)

The IEP reflects Student's history of anxiety-driven school refusal at the District

and includes the detailed information provided by Prusse. (R104 at A232–33.) That is, it shows that Student struggled in the regular synchronous classroom and thrived in the small-sized asynchronous classroom. Despite all this, the IEP would have put Student in a regular classroom for 4 hours every day without extra services or supports.

To be sure, the District was right to be concerned about Student's least restrictive environment. *See* 20 U.S.C. § 1412(a)(5)(A) (requiring that disabled students be educated with nondisabled students "[t]o the maximum extent appropriate"). After all, the ground between where he started (minimal services in a regular classroom) and where he ended up (24/7 wraparound services in a residential support program) was expansive. But its decision on that issue had to be "based on the application of expertise and the exercise of judgment," and it should be able to "offer a cogent and responsive explanation for [its] decisions that shows the IEP [was] reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Endrew F.*, 580 U.S. at 404. The District has not met this standard, as the information available did not support the conclusion that Student would gain an educational benefit by spending most of his time in a regular classroom.

The District's decision with regard to counseling is similarly unsupported. At the IEP meeting, Olivas stated that the District "typically" began with 30 minutes of counseling a week. (R100 at P3-23.) She and Hodge added that they believed "a lot" of Student's counseling was therapeutic and not for the District to address. (R100 at P3-23.) The prior written notice echoed those remarks, stating that the District refused additional counseling because it was concerned about Student's least restrictive environment and his counseling at LSH went "far beyond" his educational needs." (R104 at A246.) Again, although it was reasonable to explore whether Student's least restrictive environment was something less than LSH, the District's decision on that issue had to be based on "expertise" and sound "judgment." *Endrew F.*, 580 U.S. at 404. The record shows that the District did not draw the line at 30 minutes based on information specific to Student; instead, it employed a standard approach it used with *all* students. This means that the IEP was not designed to meet *Student's* unique needs.

The District does not seriously dispute these conclusions. It takes a different tack by attempting to draw a line between Student's medical needs and educational needs. It points out that Dr. Leehey endorsed "medically (psychiatrically) necessary residential treatment." (Resp. Br. 27–28.) And it places significance on the fact that Dr. Corelli's *psychological* assessment emphasized the importance of therapy while his *educational* assessment did not. (Resp. Br. 28.) The District further argues that numerous factors show that LSH was a medical placement rather than an educational one, and that Student's counseling was purely medical treatment. (Resp. Br. 28–32.) Based on the foregoing, the District argues that "[i]f Student had returned to the District, he would have had all of his *educational* needs met by the January 2022 IEP, and he could have had his *medical* needs met through private counseling outside of school hours." (Resp. Br. 29.)

The Court fundamentally disagrees with this approach. "If the problem prevents a disabled child from receiving educational benefit, then it should not matter that the problem is not cognitive in nature or that it causes the child even more trouble outside the classroom than within it"; the question is whether the problem "needs to be addressed in order for the child to learn." *Indep. Sch. Dist. No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769, 777 (8th Cir. 2001). The record shows that Student's emotional disability needed to be addressed so that he could access his education. The District could not avoid its responsibility to address that need merely by labeling it "medical." Indeed, the evidence relied upon by the District to supposedly distinguish between Student's medical needs and educational needs actually demonstrates that the two were inseparable. Dr. Leehey wrote that Student's mental health disorders led to "his severe and completely incapacitating non-compliance with *all* aspects of his treatment and his life"—including school. (R113 at G1 (some emphasis omitted).) And Dr. Corelli's psychological assessment suggested a "therapeutic residential school" to address Student's diagnoses, including "anxiety" and "social anxiety." (R113 at G26.)[5]

---

[5] The District argues that the fact Dr. Corelli prepared an educational assessment *and* a psychological assessment shows that Student's needs can be separated. (Resp. Br. 28.) This argument is not persuasive. All agree (even Dr. Sammons) that Student's anxiety impeded his ability to access the curriculum. (R104 at A231; R149 at 73.) Yet, Dr. Corelli's educational assessment says nothing about anxiety. This shows that he did not draw the distinctions the District claims he did.

The ALJ's analysis of this issue is not persuasive. The ALJ correctly identified the issue as whether the "January 2022 IEP denied Student a FAPE." (R131 at 31.) The ALJ then immediately reframed the "issue [as] whether a residential placement for Student was necessary for educational purposes." (R131 at 31.) This was improper: even if a residential placement was unnecessary, as the ALJ found, it would not follow that the IEP offered a FAPE. To the extent the ALJ found that the IEP did offer a FAPE, that finding appears to be based largely on the testimony of Dr. Sammons, who shifted responsibility away from the District based on the same line-drawing rejected by the Court above. (R131 at 32–33; R149 at 56, 59–60.) In addition, the ALJ placed significance on Dr. Sammons's testimony that she had never seen such a high level of service minutes offered in an IEP, which indicated to her that "the school was trying to go above and beyond" in meeting Student's needs. (R131 at 24–25; R149 at 59.) An IEP is tailored to a student's unique needs, so one student's IEP cannot be compared to another's, and Dr. Sammons's opinion is irrelevant. Finally, the ALJ's discussion of the testimony from those who knew Student was highly selective. For instance, the ALJ used Prusse's "glowing" reports of Student's progress to find that the IEP offered a FAPE. (R131 at 32.) The ALJ failed to acknowledge, however, that Prusse directly and repeatedly attributed such progress to LSH's extensive supports. (R100 at P1-9, P2-7–8, P2-10; R133 at 150–52, 176–77.)

For these reasons, the Court gives no deference to the ALJ's conclusion. The Court finds by a preponderance of the evidence that, at the time it was offered, the January 2022 IEP was not reasonably calculated to provide Student with an educational benefit.

## II.     Live Strong House was a proper placement.

Plaintiffs ask the Court to find that LSH was a proper placement for Student, which is a requirement for reimbursement. (Opening Br. 30–36.) The ALJ declined to address this issue based on her finding that the District had offered a FAPE. (R131 at 33.) The District urges the Court to also refrain from deciding this issue, arguing that the ALJ should address it in the first instance if it becomes necessary. (Resp. Br. 32.) However, the Court finds that it may decide the issue, as it has been fully exhausted. *See E.D. ex rel. Salata v.*

*Mesa Unified Sch. Dist.*, No. CV-24-01671-PHX, 2026 WL 878875, *6–12 (D. Ariz. Mar. 31, 2026) (conducting de novo review of issues presented to, but not decided by, the ALJ); *R.G. v. Glen Ridge Bd. of Educ.*, No. 05-CV-3017, 2005 WL 3274857, at *3 (D.N.J. Dec. 2, 2005) (holding that district courts "are not confined to hearing only those issues ruled upon by the ALJ").

To establish that a placement was proper, the parents "need not show that a private placement furnishes every special service necessary to maximize their child's potential"; rather, they "need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a [disabled] child, supported by such services as are necessary to permit the child to benefit from instruction." *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) (emphasis omitted) (quoting *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006)). The placement does not need to satisfy the requirements for a FAPE. *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 13 (1993).

The record shows that LSH provided specially designed instruction and related services needed to permit Student to benefit from his education. Student exhibited school refusal because of social anxiety, depression, and executive functioning deficits. (R133 at 146–47; R140 at 27.) LSH met his unique needs by providing him with self-paced classes in a small class environment (R100 at P1-7–8); one-on-one instruction from an executive functioning coach (R100 at P2-19; R133 at 156, 163, 166); one-on-one specially designed instruction from Prusse (a special education teacher) or from a general education teacher under Prusse's supervision (R100 at P3-22); academic tutoring (R100 at P1-9; P3-20); individual and group therapy multiple times a week, where he worked on dealing with his anxiety so that he could engage in the classroom (R100 at P3-21; R110 at D150; R133 at 159; R140 at 16–19); and access to his therapist during school hours to help with periods of anxiety (R140 at 17). The record also shows that Student benefited from LSH's services, as he recovered his grade level, passed all his classes with As and Bs (and one C), and graduated from high school. (R110 at D244–45, 252; R133 at 172–73, 179.)

The foregoing establishes that LSH was a proper placement. *See Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg*, 59 F.3d 884, 896 (9th Cir. 1995) (finding a placement proper because its small class, behavior management plan, and group counseling met the student's unique needs and because the student "did better academically"); *S.L. ex rel. Loof v. Upland Unified Sch. Dist.*, 747 F.3d 1155, 1160 (9th Cir. 2014) (finding a placement proper because, in concert with privately hired aids, it provided "instructional materials and curriculum, structure, support, and socialization," and because the student "became more socially involved" and "received good grades"); *Bellflower Unified Sch. Dist. v. Lua*, 832 F. App'x 493, 496–97 (9th Cir. 2020) (finding a placement proper because it provided the student with diagnostic testing, one-on-one tutoring, and extra teacher help).

None of the District's arguments to the contrary is persuasive. The District argues first that the placement was not proper because it was "necessary to address medical, social, or emotional problems quite separate and apart from the learning process." (Resp. Br. 33.) The District further argues that this case is analogous to *JG v. Creighton Elementary School District*, No. CV-21-00535-PHX, 2022 WL 278501, at *6–9 (D. Ariz. Jan. 31, 2022), where the district court drew that distinction in ostensibly similar circumstances. (Resp. Br. 33–34.) As an initial matter, the Court agrees with Plaintiff that there is an incongruity in the District's argument. (Reply Br. 13.) The District found Student eligible for services based on an emotional disability, and it repeatedly acknowledged that Student's social and emotional problems impeded his education. The District's current argument that Student's problems were separate from the learning process is at odds with these facts. In any event, as explained throughout this report, the record shows that Student's problems were directly related to his educational performance. That those problems had become so great outside the educational environment as to warrant a residential placement does not make the placement improper. *See Edmonds Sch. Dist. v. A.T.*, 780 F. App'x 491, 495 (9th Cir. 2019) (rejecting an argument similar to the District's because "[s]tudents who require residential placement to obtain an educational benefit are often experiencing some acute health crisis at the time they are placed—the severity of their condition is precisely why they need

residential treatment"). To the extent *JG* is not distinguishable, that case is neither binding nor persuasive.

Next, the District emphasizes that LSH itself is not an accredited school and that it receives its educational services pursuant to a contract with Coral Sands Academy, Inc. (Resp. Br. 35; R110 at D88.) Coral Sands is an online private school with its own teachers, and any student anywhere can enroll in Coral Sands and complete the program without an in-person teacher. (R133 at 233–34, 245.) Student was supervised online by Coral Sands's teachers, had his work graded by Coral Sands's teachers, and received his high school diploma from Coral Sands. (R133 at 244–45.) Based on the foregoing, the District argues that LSH is a residential support program that provides therapeutic intervention, not an educational placement. (Resp. Br. 35.)

This argument is not persuasive, as it ignores the unique relationship between LSH and Coral Sands. Prusse testified that educating LSH students was a "team" effort. (R133 at 183.) Megan Pomeroy, Coral Sands's academic director, agreed. (R133 at 242.) Pomeroy also testified that "Live Strong House and Coral Sands work really closely together" to "provide the best education [they] can for the students." (R133 at 242.) Further, the record shows that LSH is deeply involved in its students' education. LSH has its own general educational teachers (albeit uncertified), and Students at LSH do not have access to the online curriculum unless there is an LSH teacher present. (R133 at 133–34, 202.) Prusse determines what specially designed instruction LSH students need and communicates those needs to Coral Sands so that the curriculum can be modified. (R133 at 133, 236, 243.) In addition, some of Coral Sands's credits are for participation in LSH therapy, as tracked by LSH clinicians. (R133 at 248–49.) Finally, Pomeroy knew that Student received specially designed instruction from an LSH teacher during offline periods. (R133 at 239, 242–43.)

Given the foregoing, the record does not support the District's attempt to frame LSH as a purely medical placement. The Court finds by a preponderance of the evidence that LSH was a proper placement.

. . . .

**III.      Plaintiffs are entitled to reimbursement for tuition.**

Plaintiffs seek reimbursement for tuition paid to LSH and for related expenses. (Opening Br. 40.) The District argues that reimbursement is barred under the applicable regulations. (Resp. Br. 36–37.) The District further argues that the equities favor denying Plaintiffs relief because of Parents' unreasonable conduct. (Resp. Br. 38–39.) As discussed below, the Court finds that Plaintiffs are entitled to reimbursement for tuition through Student's graduation, as well as for their related expenses. Plaintiffs have not shown that they should recover for Student's postgraduation stay at LSH.

The District's regulatory argument is straightforward. One regulation authorizes reimbursement for the costs of a "private . . . secondary school." 34 C.F.R. § 300.148(c). Another defines "secondary school" to mean "a nonprofit institutional day or residential school." *Id.* § 300.36. LSH is a for-profit entity. (R107 at B446.) So, the District argues, LSH is not a "secondary school" whose costs are reimbursable. (Resp. Br. 36–37.)

This argument is not persuasive. Prior to enactment of the reimbursement statute and regulation, the U.S. Supreme Court held that reimbursement for private school tuition was available under what is now 20 U.S.C. § 1415(i)(2)(C)(iii). *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985). That statute provides that the court "shall grant such relief as the court determines is appropriate." The Court held that reimbursement is "appropriate" when the school fails to provide a FAPE and the private placement is proper. *Burlington*, 471 U.S. at 370. It further explained that the IDEA "was intended to give [disabled] children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives." *Id.* at 372. The Court later reaffirmed the availability of reimbursement under § 1415(i)(2)(C)(iii) in *Florence County School District Four v. Carter ex rel. Carter*, 510 U.S. 7, 9–10 (1993). There again, the Court emphasized that the "IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free," and it rejected an interpretation that "would defeat this statutory purpose." *Id.* at 13–14 (citing *Burlington*, 471 U.S. at 373).

The reimbursement provision was enacted after *Carter*. It provides:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

20 U.S.C. § 1412(a)(10)(C)(ii); *see* 34 C.F.R. § 300.148(c) (implementing the statute).

The Supreme Court examined this provision in *Forest Grove School District v. T.A.*, 557 U.S. 230 (2009). There, after the school district determined that the student was not eligible for special education services, the parents enrolled him in a private school and then sought reimbursement. *Id.* at 233–35. The school district argued that the parents were not entitled to reimbursement under § 1412(a)(10)(C)(ii), as the student had not "previously received special education and related services." *Id.* at 241. The Court rejected the school district's argument, explaining that because the statute "is phrased permissively, stating only that courts 'may require' reimbursement in those circumstances, it does not foreclose reimbursement awards in other circumstances." *Id.* The Court found that Congress did not intend to abrogate *Burlington* and *Carter* when it enacted § 1412(a)(10)(C)(ii), such that reimbursement remained available under § 1415(i)(2)(C)(iii). *Id.* at 243–44. And the Court reiterated that federal courts should avoid interpreting the IDEA in ways that would render a student's "right to a *free* appropriate education . . . less than complete." *Id.* at 244–45 (quoting *Burlington*, 471 U.S. at 370).

These cases establish that Plaintiffs may obtain reimbursement even if they do not satisfy the requirements of § 1412(a)(10)(C)(ii) or its implementing regulation, 34 C.F.R. § 300.148(c). They are entitled to reimbursement under § 1415(i)(2)(C)(iii) so long as the District failed to provide a FAPE and LSH was an appropriate placement. *Burlington*, 471 U.S. at 370. As explained above, those conditions are satisfied, so Plaintiffs may obtain reimbursement. *See N.Y.C. Dep't of Educ. v. V.S.*, No. 10–CV–05120, 2011 WL 3273922, at *16–17 (E.D.N.Y. July 29, 2011) (reaching the same conclusion on similar facts).

The District further argues that, even if Plaintiffs are eligible for reimbursement, the

equities favor denying them that relief. A district court "enjoys 'broad discretion'" in fashioning equitable relief under the IDEA. *Carter*, 510 U.S. at 16 (quoting *Burlington*, 471 U.S. at 369). The District argues that Parents acted unreasonably by not providing notice after the May 2021 IEP meeting that they had rejected the District's placement and not providing the District with Dr. Leehey's letter until after Student was placed at LSH. The District argues that such conduct "denied the District the opportunity to draft an IEP that addressed Student's increased needs before they placed him at LSH." (Resp. Br. 38.)

The Court agrees that Parents could have been clearer about their decisions and the reasons for their decisions. However, the District was well aware of Student's emotional problems when it drafted the May 2021 IEP, so Parents' failure to provide additional information at that time was not as obstructive as the District claims. In addition, the District's conduct with respect to the May 2021 IEP was also unreasonable. From the perspective of Student's enrollment in the District, the IEP repeated what had already been a complete failure. From the perspective of Student's future placement, the District violated the law requiring that an IEP not be drafted with the placement already determined. The District further argues that Parents acted unreasonably by not providing Dr. Corelli's educational assessment until midway through the first meeting for the January 2022 IEP. (Resp. Br. 38.) The Court agrees again. But as the IEP was developed over three sessions spanning a two-month period, Parents' failure had no effect on the outcome. Such failure therefore is not a reason to deny relief. On balance, the equities support reimbursement.[6]

The last issue, then, is what costs should be reimbursed. Plaintiffs seek $58,360, which is the amount of tuition that they paid out of pocket prior to Student's graduation. (Opening Br. 40; R142 at 57.) Plaintiffs also seek $7,389.99 in travel, lodgings, and related expenses incurred to visit Student at LSH. (Opening Br. 40; R100 at P7-120.) While the District takes issue with awarding Plaintiffs reimbursement at all, it does not specifically

---

[6] The District also argues that it has no responsibility for costs incurred after Student turned 18, since, under state law, he was no longer a resident pupil of the District. (Resp. Br. 38.) However, even if the District is correct about state law, that would not bar the Court from granting federally authorized equitable relief under the IDEA. *See Forest Grove*, 557 U.S. at 244–45 (rejecting an argument that would render a "child's right to a *free* appropriate education . . . less than complete" (quoting *Burlington*, 471 U.S. at 370)).

- 27 -

challenge the reasonableness of these figures. In any event, the Court finds that the figures are reasonable. *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1527–28 (9th Cir. 1994) (affirming a grant of "reimbursement for reasonable transportation and lodging expenses . . . as related services"). The Court also finds that the equities favor awarding the full amounts requested. The Court did consider whether Parents' conduct warrants a reduction. But the District's overall conduct—recognizing that Student's school refusal was anxiety-driven but doing nothing to address it in the August 2020 and May 2021 IEPs, and basing the January 2022 IEP on uninformed medical-versus-educational line-drawing—weighs against reducing the award.

Plaintiffs also request $61,620 for the cost of Student's postgraduation program at LSH. (Opening Br. 40.) Their theory is that because the IEPs did not provide adequate transition services (activities designed to facilitate movement from school to post-school life), the District should pay for services provided at LSH after graduation. (R72 at 50.) However, the Court finds that they are not entitled to reimbursement or a compensatory fund for these costs. The District's obligation to provide a FAPE terminated once Student graduated. 34 C.F.R. § 300.102(a)(3)(i). Further, LSH is a "transitional program," and the record shows that Student received transition services before graduating. (R100 at P1-13, P2-10.) These included, among other things, development of independent living skills in the community and work with a college advisor. (*See* R100 at P1-10, P1-13, P3-12.) The award of reimbursement for pre-graduation tuition accounts for any deficiencies in the IEPs' transition services, and no other relief is warranted.

### Conclusion

The Court recommends that the district judge (1) reverse the ALJ's decision, (2) find that the August 2020, May 2021, and January 2022 individualized education programs did not provide Student with a free appropriate public education; (3) find that Live Strong House was an appropriate placement; (4) order the District to reimburse Plaintiffs in the amount of $65,749.99; and (5) authorize Plaintiffs' counsel to file a motion for attorney's fees.

This recommendation is not immediately appealable to the United States Court of Appeals for the Ninth Circuit. The parties have 14 days to file specific written objections with the district court. Fed. R. Civ. P. 72(b)(2). The parties have 14 days to file responses to objections. *Id.* The parties may not file replies on objections absent the district court's permission. A failure to file timely objections may result in the waiver of de novo review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 10th day of April, 2026.

Honorable Maria S. Aguilera
United States Magistrate Judge